UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

KATHY T. WILLIS,                           )
(Social Security No. XXX-XX-2311),         )
                                           )
                  Plaintiff,               )
                                           )
            v.                             )          3:10-cv-57-WGH-RLY
                                           )
MICHAEL J. ASTRUE,                         )
COMMISSIONER OF SOCIAL                     )
SECURITY,                                  )
                                           )
                  Defendant.               )


## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 8,

12) and an Order of Reference entered by Chief Judge Richard L. Young on June

21, 2010 (Docket No. 15).


## I.  Statement of the Case

Plaintiff, Kathy T. Willis, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability

Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under the

Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. §

404.1520(f).  This court has jurisdiction over this action pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3).

Plaintiff had filed two previous applications for SSI and DIB, with the most recent decision coming on October 18, 2006, indicating that Plaintiff retained the residual functional capacity ("RFC") to perform her past work.[1] (R. 135-40).

Plaintiff applied for DIB and SSI on May 18, 2007, alleging disability since April 8, 2003. (R. 222-24, 230-35). The agency denied Plaintiff's application both initially and on reconsideration. (R. 165-82, 185-98). Plaintiff appeared and testified at a hearing before Administrative Law Judge Arline Colon ("ALJ") on April 20, 2009. (R. 90-127). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 90). On May 18, 2009, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the RFC to perform her past work. (R. 8-22). After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on April 13, 2010, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 54 years old at the time of the ALJ's decision and had a high school education. (R. 222). Her past relevant work experience included work as

---

[1]This decision was upheld by the Appeals Council and not appealed by Plaintiff. Therefore, it is res judicata, and Plaintiff cannot be found disabled prior to October 18, 2006.

a clerical worker (light semi-skilled), receptionist (sedentary semi-skilled), companion (light semi-skilled), and cashier (light semi-skilled). (R. 21).

## B. Medical Evidence

### 1. Transient Ischemic Attack and Sleep Apnea

Plaintiff was admitted to Daviess Community Hospital on December 31, 2007, for a probable transient ischemic attack ("TIA") resulting in dizziness, confusion, and slurred speech. (R. 788-89). She had been playing bingo. (R. 788). By the time she reached the hospital her condition was normal, and a CT scan of her brain was normal. (R. 788). However, an MRI of the brain showed a two centimeter area of irregular high T2 signal intensity that could be due to a focal infarct or microinfarct; a carotid doppler was negative for blockage. (R. 788). She was kept overnight for observation, prescribed Plavix, and instructed to follow up with her family physician, Jerry Hancock, D.O., and neurologist, Dr. Obaid. (R. 789).

Anand Bhuptani, M.D. diagnosed Plaintiff with severe obstructive sleep apnea on February 14, 2008, and prescribed C-PAP treatment. (R. 762-63).

Upon follow-up on March 4, 2008, it was noted that Plaintiff's testing after her TIA revealed no evidence of stroke but did reveal her sleep apnea, and Plaintiff was feeling much better since beginning to use a C-PAP machine. (R. 628-29). An exam revealed that Plaintiff's pain was a zero on a scale of zero to ten, and that her mental status was normal with normal attention span and concentration. (R. 629). A motor and sensory exam revealed normal results,

including normal muscle strength.  (R. 629).  Plaintiff underwent a similar normal physical and mental exam on January 24, 2008.  (R. 630-31).

### 2.  Carpal Tunnel Syndrome

Henry Matick, D.O., performed an EMG on December 29, 2006, finding mild bilateral carpal tunnel syndrome and mild bilateral ulnar nerve entrapments at the elbow.  (R. 368).

On January 31, 2007, George Morgan, M.D., evaluated Plaintiff's complaints of burning in her left elbow and tingling in her fingers.  It was noted that Plaintiff did not drop objects.  (R. 386).  Plaintiff displayed no muscle wasting in her right hand and wrist.  (R. 386).

Plaintiff attended occupational therapy on April 20, 2007; she indicated that her pain had completely resolved with wrist splints, and that her numbness had resolved but returned.  (R. 373).  Plaintiff's grip strength was in the excellent range, and she had minimally reduced strength in her arms and shoulders.  (R. 373).

On April 25, 2007, Dr. Morgan wrote a letter concerning Plaintiff's tennis elbow and carpel tunnel syndrome.  Dr. Morgan indicated that Plaintiff's elbow was completely resolved, and that her carpel tunnel syndrome was not a significant problem and was tolerable.  (R. 385).

She returned to occupational therapy on August 8, 2008, complaining of bilateral hand pain and numbness; it was indicated that Plaintiff does her own housework, but has difficulty lifting pans and laundry.  (R. 640-43).

### 3. Lower Back Pain

An X-ray of Plaintiff's back taken May 10, 2006, revealed mild degenerative joint disease. (R. 409).

Plaintiff saw Dr. Morgan on October 17, 2006, with complaints of right leg pain that radiated into her foot. (R. 387). It was noted that Plaintiff had undergone a spinal fusion in 2003. An exam of Plaintiff's right hip was normal, and Dr. Morgan opined that Plaintiff's symptoms may be due to a failed spinal fusion; he recommended that Plaintiff see a back specialist. (R. 387). Notes from Plaintiff's family nurse practitioner on October 26, 2006, indicate that Plaintiff did not want to see a back specialist if it could result in surgery. (R. 472).

Plaintiff attended pain management with Mahendra Sanapati, M.D., and received injections from May to October 2007. (R. 547-51).

On April 18, 2008, Plaintiff reported pain in her lower back that radiated into her leg and was given an injection on April 30. (R. 636).

A follow-up X-ray on March 10, 2009, confirmed mild degenerative joint disease of the entire lumbar spine, with mild disk space narrowing of L3-L4; bilateral sacroilitis, more marked on the left side. (R. 884).

Dr. Hancock filled out a form on April 14, 2009, indicating that in an eight-hour workday, Plaintiff would consistently be able to do the following: stand less than 20 minutes and walk less than ten minutes without resting; consistently lift and carry less than ten pounds; would miss three or more days

per month; would need one or more extra breaks on half the workdays in a typical month; and would be unable to stay focused for at least seven out of eight hours in a workday on two or more days per month. (R. 959). He opined that Plaintiff was totally disabled. (R. 959). Dr. Hancock had also noted his opinion that Plaintiff was disabled on February 26, 2009. (R. 881).

### 4. Arthritis and Obesity

X-rays of the right knee taken June 15, 2005, left knee taken September 8, 2006, and right hip taken October 17, 2006, reveal moderate osteoarthritis in all three locations. (R. 380-82).

On March 4, 2008, Plaintiff reported that both knees were doing well and that she had very little symptoms from either of them. (R. 726).

Dr. Morgan diagnosed tricompartmental arthritis in both knees on September 2, 2008, prescribing a knee brace. (R. 725). Additionally, it was noted that Plaintiff is five feet, three inches tall and weighs 239 pounds with a BMI of 41, which was essentially unchanged from a year earlier. (R. 725).

In October 2008, Dr. Morgan indicated that Plaintiff was tolerating her knee brace. (R. 724). On December 23, 2008, Dr. Morgan wrote that a brace was helping with Plaintiff's knee pain, that he was putting off indefinitely any joint replacement surgery, and that Plaintiff should continue her current activity level and attempt to keep her weight under control. (R. 723).

In February 2009, Plaintiff indicated that she planned to seek counseling about gastric surgery in May. (R. 829).

### 5. Plaintiff's Mental Health

Plaintiff first sought mental health treatment on May 10, 2007, at the Samaritan Center. (R. 358-61). She indicated that she had no prior history of psychiatric problems. (R. 358). It was noted that she had no current or enduring disabilities, but did suffer from pain. (R. 359). She was diagnosed with major depression, moderate, recurrent; she was assigned a GAF score of 50, with 60 being her highest GAF over the past year. (R. 361).

On May 17, 2007, Plaintiff began therapy for depression at the Samaritan Center under the direction of Michael Cantwell, M.D., and a therapist, Gretchen Childress. (R. 350-52). It was noted that she was to attend sessions once a week. (R. 350). At a session on May 30, 2007, Plaintiff's affect and mood were appropriate, she was oriented, her thought process was logical and coherent, and she had no plan to harm herself or others. (R. 348).

Ms. Childress completed a Report of Psychiatric Status on June 25, 2007. (R. 519-24). Several portions of the report indicated that it was based on statements from Plaintiff's daughter. (R. 523). Plaintiff was again diagnosed with major depression, recurrent, moderate; she was again assigned a GAF score of 50, with a score of 60 being the highest score in the past year. (R. 519). Plaintiff's affect was slightly depressed and tearful, she was oriented, her thought process was coherent, and she had some difficulty with short term memory. (R. 520). Plaintiff's daughter reported that Plaintiff had no friends, did nothing, argues or cries when confronted by family members, does basically no

housework, and cannot tolerate being around her grandchildren. (R. 523). At the time of evaluation, Plaintiff's impairment was expected to last in excess of six months and her prognosis was fair to good. (R 524).

A September 11, 2007, note from a therapy session indicated that Plaintiff was occasionally walking with a friend. (R. 584).

At a therapy session on April 1, 2008, she was advised to try to do volunteer work, but Plaintiff indicated that she had been discouraged to do volunteer work by her previous attorney. (R. 693).

On December 17, 2008, a therapy session indicated that Plaintiff was attending a new church and liked it. (R. 661).

### 6. State Agency Review

J. Sands, M.D., completed a Physical Residual Functional Capacity Assessment on June 26, 2007. (R. 509-16). He limited Plaintiff to essentially light work, with no manipulative or postural limitations, based upon his review of the medical evidence. (R. 510-12). On October 8, 2007, M. Ruiz, M.D., affirmed the assessment. (R. 627).

On July 11, 2007, DDS consultant Donna Unversaw, Ph.D., completed a Mental Residual Functional Capacity Assessment and found only moderate impairments in Plaintiff' ability to understand and remember, sustain concentration and persistence, and adapt to workplace settings. (R. 526-28). This assessment was affirmed by William Shipley, Ph.D., on October 3, 2007. (R. 626).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in

order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date and that Plaintiff was insured for DIB through December 31, 2008. (R. 13). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had twelve impairments that are classified as severe: sleep apnea; insulin dependent diabetes mellitus; history of transient ischemic attack; lumbar spondylosis; post laminectomy syndrome; major depressive disorder; obesity; mild hypothyroidism; bilateral sacriolitis; mild degenerative disc disease of the lumbar spine; tricompartmental knee arthritis, left worse than right; and mild carpal tunnel syndrome. (R. 14). The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14). The ALJ

determined that Plaintiff's testimony was not fully credible. (R. 17-19). The ALJ then found that Plaintiff retained the following RFC: light work except that she must be allowed to sit or stand for one or two minutes after maintaining the same position for 30 or 45 minutes; she is also limited to frequent handling/ fingering and occasional postural activities; and she can do detailed but not complex work. (R. 16). The ALJ determined that, based on this RFC, Plaintiff could perform her past work. (R. 21). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 21).

## VI. Issues

Plaintiff has raised four issues. The issues are as follows:

1. Whether remand is necessary for consideration of new evidence.

2. Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.

3. Whether the ALJ's credibility determination is patently wrong.

4. Whether the ALJ failed to give proper weight to the various medical opinions.

**Issue 1:    Whether remand is necessary for consideration of new evidence.**

Plaintiff first argues that the court should remand the ALJ's decision for consideration of new evidence. A federal court may not consider new evidence in reviewing the ALJ's decision. *Rasmussen v. Astrue,* 2007 WL 3326524 at *4 (7th Cir. 2007). However, the court may remand for an ALJ to consider additional evidence, if such evidence is both new and material, and if there has been shown

good cause for the failure to incorporate the evidence into the record in a prior proceeding. 42 U.S.C. § 405(g); *Schmidt v. Barnhart,* 395 F.3d 737, 741-42 (7th Cir. 2005). Evidence is considered "new" if it was not available or in existence at the time of the administrative proceeding. *Schmidt*, 395 F.3d at 741-42. The evidence is "material" if there is a reasonable probability that the ALJ would have reached a different conclusion had he considered the evidence, meaning that the evidence must be relevant to plaintiff's condition during the relevant time period under consideration by the ALJ. *Id.*

Plaintiff alleges that remand is necessary to consider the results of objective medical testing regarding arthritis in her hands and her carpal tunnel syndrome, as well as opinions of Dr. Morgan concerning this testing. (R. 960-65). These materials are dated in May and June of 2009, some five to six months after her date last insured. This evidence does not meet the definition of new and material evidence because it is not relevant to the time period under consideration by the ALJ. All four of the pieces of evidence are based on testing performed five or six months after December 31, 2008, when Plaintiff became no longer insured for DIB and after the ALJ's decision was rendered on May 18, 2009. It is important to remember that Plaintiff alleges she became disabled on April 8, 2003. A test performed after she was no longer insured for DIB and after the ALJ rendered her decision could indicate that Plaintiff's condition has worsened and that she may be able to demonstrate disability *after* that date. But, in this case, it has no bearing on whether Plaintiff was disabled at some

point between her alleged onset date and the date last insured.  Remand is, therefore, unnecessary.

**Issue 2:**     **Whether the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.**

Plaintiff next argues that the ALJ's RFC assessment was flawed because it did not take into account the severity of Plaintiff's hand and arm weakness. Plaintiff relies, in part, on evidence submitted to the Appeals Council, but not before the ALJ.  As discussed above, the court is not permitted to consider this evidence in reviewing the ALJ's decision.  As for the evidence that *was* before the ALJ, an EMG on December 29, 2006, indicated mild findings.  (R. 368).  Notes from Plaintiff's therapy session on April 20, 2007, indicate that her pain had completely resolved with wrist splints, her grip strength was in the excellent range, and she had minimally reduced strength in her arms and shoulders.  (R. 373).  And, on April 25, 2007, Dr. Morgan wrote a letter indicating that Plaintiff's elbow was completely resolved, and that her carpel tunnel syndrome was not a significant problem and was tolerable.  (R. 385).  Despite these mild findings and indications that Plaintiff's hand/arm had responded positively to therapy, the ALJ still limited Plaintiff to frequent handling/fingering.  There was clearly substantial evidence in the record to support the ALJ's RFC determination, and it must be affirmed.

**Issue 3:**     **Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also argues that the ALJ conducted a flawed analysis of her credibility.  An ALJ's credibility determination will not be overturned unless it is

"patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain. Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or*

*psychologists and other persons about the symptoms and how they
affect the individual, and any other relevant evidence in the case
record.* This requirement for a finding on the credibility of the
individual's statements about symptoms and their effects is reflected
in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the
regulations provide that an individual's symptoms, including pain,
will be determined to diminish the individual's capacity for basic
work activities to the extent that the individual's alleged functional
limitations and restrictions due to symptoms can reasonably be
accepted as consistent with the objective medical evidence and other
evidence in the case record.

SSR 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's

decision regarding the claimant's credibility "must contain specific reasons for

the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's

subjective individual symptoms, such as pain, are considered, several factors are

relevant, including: (1) the individual's daily activities; (2) the location, duration,

frequency, and intensity of the individual's pain or other symptoms; (3) factors

that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness,

and side effects of any medication the individual takes or has taken to alleviate

pain or other symptoms; (5) treatment, other than medication, the individual

receives or has received for relief of pain or other symptoms; (6) any measures

other than treatment the individual uses or has used to relieve pain or other

symptoms; and (7) any other factors concerning the individual's functional

limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ, here, conducted a very thorough assessment of Plaintiff's credibility at pages 17-19 in the record. Contrary to Plaintiff's allegations, this credibility determination was not patently wrong. First, the ALJ rightly noted that Plaintiff's allegation that she needed a knee replacement was in direct conflict with a December 2008 opinion from Dr. Morgan that Plaintiff was not in need of a knee replacement. Second, Plaintiff alleges that she dropped things, but other records during the relevant time period indicate that Plaintiff did not drop objects (R. 386), and that Plaintiff's elbow was completely resolved, and her carpel tunnel syndrome was not a significant problem and was tolerable. (R. 385). Third, Plaintiff alleges that she engaged in almost no activity and did almost no housework. However, on September 11, 2007, Plaintiff was occasionally walking with a friend (R. 584); Plaintiff was playing bingo with her friends on December 31, 2007, when she suffered her probable TIA; on August 8, 2008, it was indicated that Plaintiff does her own housework, but has difficulty lifting pans and laundry (R. 640-43); and on December 17, 2008, Plaintiff was attending a new church and liked it (R. 661). Based on this evidence, Plaintiff's activities of daily living were more substantial than she had alleged. Finally, there was some evidence in the record that Plaintiff was not complying with a doctor's recommendations and was actually intentionally refraining from activity at the advice of an attorney. Based on the totality of the evidence, the court

concludes that the ALJ's credibility determination was not patently wrong and must be upheld.

**Issue 4: Whether the ALJ failed to give proper weight to the various medical opinions.**

Finally, Plaintiff argues that the ALJ failed to give controlling weight to the opinions of Dr. Hancock and Dr. Cantwell.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

(d)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature

-17-

and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.

Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

Plaintiff essentially is arguing that the ALJ should have given controlling weight to the opinions contained in a form that Dr. Hancock filled out on April 14, 2009, in which he opined that Plaintiff was totally disabled (R. 959) and a report from Dr. Cantwell on June 25, 2007 (R. 519-24).

As for the report from Dr. Cantwell, it appears that report was actually completed by Ms. Childress who was a therapist in Dr. Cantwell's office and

included statements of Plaintiff's daily activities from Plaintiff's daughter. This report was not entitled to controlling weight for several reasons. First, the fact that it was created by someone other than a doctor automatically renders it not entitled to controlling weight. However, even if the fact that Dr. Cantwell signed off on the report several days after it was created makes it the opinion of a doctor, it is still not entitled to controlling weight. The opinion relies on extremely exaggerated subjective allegations. Plaintiff's daughter alleges that Plaintiff was basically intolerable, completely withdrawn socially, and did nothing. (R. 523). This is not an accurate picture of Plaintiff's life, as reflected in records from other sessions well after the report created by Ms. Childress. These records indicated that Plaintiff was occasionally walking with a friend and had chosen a new church and liked it. (R. 584, 661). Additionally, it appears from the record that Plaintiff may have been purposefully engaging in less activity than she could have at the advice of an attorney. (R. 663). Furthermore, other records indicate that Plaintiff's daughter's report was exaggerated; for example, six months later on December 31, 2007, Plaintiff was playing bingo with her friends when she experienced a possible TIA. (R. 788-89). Finally, the report was not consistent with other records of Dr. Cantwell. For instance, on May 30, 2007, Plaintiff's affect and mood were appropriate, she was oriented, her thought process was logical and coherent, and she had no plan to harm herself or others. (R. 348). In light of all of these problems with the June 25 report, it was not entitled to

controlling weight, and the ALJ's decision to reject it is supported by substantial evidence.

Regarding Dr. Hancock's form, the court notes that Dr. Hancock checked the most extreme limitation possible in each area that the form concerned. Yet, there are no objective medical tests to support such extreme limitations. An X-ray from March 10, 2009, indicated mild results for Plaintiff's lumbar spine. (R. 884). Following Plaintiff's TIA, exams in January and March 2008 indicated normal results, including normal muscle strength and a pain level at zero. (R. 628-31). On March 4, 2008, Plaintiff reported that both knees were doing well and that she had very little symptoms from either of them. (R. 726). On December 23, 2008, Dr. Morgan wrote that a brace was helping with Plaintiff's knee pain, that he was putting off indefinitely any joint replacement surgery, and that Plaintiff should continue her current activity level and attempt to keep her weight under control. (R. 723). These results indicate that Plaintiff's impairments were not nearly as severe as Dr. Hancock suggested. And, Plaintiff has not directed the court to any exam results that indicated an abnormal gait or station, or a limited range of motion, or problems with muscle strength/sensation in Plaintiff's legs. Without such objective test results to support Dr. Hancock, his list of severe limitations were not entitled to controlling weight.

## VII. Conclusion

Remand is not necessary for consideration of new evidence. Additionally, The ALJ's RFC analysis is supported by substantial evidence. The ALJ was also

not obligated to give controlling weight to the opinions of Dr. Hancock and Dr.

Cantwell.  And, the ALJ's credibility determination was not patently wrong.  The

decision of the Commissioner of the Social Security Administration is

**AFFIRMED.**

      **SO ORDERED** the 17th day of February, 2011.

_William G. Hussmann, Jr._
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

John Ryan Worman
WOODS & WOODS, LLP
jworman@woodslawyers.com